174

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOHN BARIS, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DANIEL CREACO, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MARY LOU ENTWISTLE, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v SALVATORE A. INSERRA, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v EDWARD A. PARKER, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v OSVALDO ("TONY") PARDO, Appellant.

Fourth Department, April 4, 1986

## APPEARANCES OF COUNSEL

*John Longeretta* for John Baris, appellant.

*Leslie R. Lewis* for Daniel Creaco, appellant.

*Frank E. Blando* for Mary Lou Entwistle, appellant.

*George F. Aney* and *Dean L. Gordon* for Salvatore A. Inserra, appellant.

*Frank Policelli* and *Paul R. Shanahan* for Edward A. Parker, appellant.

*Wiles, Fahey & Lynch* and *Emil M. Rossi (Joseph Fahey* of counsel), for Osvaldo ("Tony") Pardo, appellant.

*Barry M. Donalty, District Attorney (Michael Daley* of counsel), for respondent.

## OPINION OF THE COURT

Schnepp, J.

On these multidefendant appeals myriad related issues are raised concerning the existence of probable cause for eavesdropping and search warrants and compliance by the prosecution with various requirements of CPL article 700.

After the police uncovered an extensive cocaine trafficking conspiracy among the defendants, they were charged in six separate indictments with controlled substances related crimes. Edward A. Parker and Mary Lou Entwistle, who resided together in Oneida County, were charged with possessing large amounts of cocaine which they received from defendant Osvaldo A. Pardo who lived in Florida. The other defen-

dants, John Baris, Daniel E. Creaco, Jr., and Salvatore A. Inserra also resided in Oneida County and participated in the operation by buying drugs from Parker and reselling them. On August 30, 1983 the State Police arrested Parker and seized from his home in rural Remsen, New York, approximately 26 pounds of cocaine with an estimated street value of $10 million. In addition to Parker the State Police also arrested his girlfriend Entwistle, and Baris, Creaco and Inserra. Pardo, who was arrested on August 31, 1983 on a Federal warrant, was arraigned on the State charges following his indictment by an Oneida County Grand Jury. The raid on Parker's residence was the culmination of a long investigation over a period of several months which involved undercover drug buys from persons suspected of dealing with Parker, the development of information from an informant and the extensive use of a wiretap on Parker's telephone. Following the denial of their motions to suppress evidence obtained pursuant to three eavesdropping and five search warrants issued between June 14 and September 1, 1983, the defendants pleaded as follows in satisfaction of these various indictments: Baris, Creaco and Entwistle to conspiracy in the second degree; Inserra to criminal possession of a controlled substance in the second degree; Parker to criminal possession of a controlled substance in the first degree; and Pardo to criminal sale of a controlled substance in the second degree and conspiracy in the second degree.

### FACTS

In January 1983, the State Police commenced an investigation after they were apprised that the Utica City Police had obtained drug information regarding Parker. On or about April 6, 1983, undercover State Trooper Orlando D'Elia learned from a confidential informant, Joseph Santillo, that Parker was dealing in large quantities of cocaine. Santillo, who accurately identified other individuals as cocaine dealers and arranged for D'Elia to make drug purchases from these individuals, informed D'Elia that Parker dealt "approximately 20 kilos of cocaine a month" from his home in Remsen and that a year previously he was in Parker's house and witnessed the sale by Parker of one ounce out of a kilo of cocaine to Creaco. Santillo agreed to work with D'Elia in an attempt to infiltrate Parker's narcotics operation. Later in April D'Elia attempted to purchase cocaine from Creaco; however, after initially agreeing to sell the cocaine, Creaco refused to go

through with the transaction because he had heard that D'Elia was "wired to the police". On April 26, 1983, Santillo introduced D'Elia to Walter Raymond who agreed to sell him cocaine. According to D'Elia, Raymond claimed that Parker was his direct supplier. Raymond sold cocaine to D'Elia on April 28, May 3 and May 17, 1983.

The State Police attempted to establish independently whether Raymond actually was dealing with Parker by arranging to purchase a large quantity of cocaine from him on May 17, 1983 at a bar near Parker's house and setting up a surveillance in the vicinity of the Parker residence in an effort to verify whether Raymond visited Parker's house.[1] D'Elia received a prearranged call from Raymond at 6:50 P.M. during which Raymond claimed he was calling from Parker's residence. At that time, the surveillance had been established near Parker's residence to verify that Raymond was there at the arranged time but the effort was terminated "due to the remoteness of the area, and a sudden increase in traffic" and it was implied that the surveillance was discontinued before 6:30 P.M. It was later disclosed, however, that the surveillance was in place from 5:30 P.M. until approximately 7:40 P.M. during which time Raymond was not observed in the vicinity of the Parker residence.

On June 14, 1983, the Oneida County District Attorney applied under CPL 700.20 to Oneida County Court Judge Arthur A. Darrigrand for an eavesdropping warrant to authorize the tapping of Parker's home telephone. The affidavits in support of the application recited the information learned from Santillo and Raymond that Parker sold large quantities of cocaine from his house. State Police Investigator Michael Navin added information obtained from a pen register that Parker's phone had been used to place calls to the phones of individuals identified by the FBI as suspected drug dealers.[2] The court approved the application and issued a warrant on June 14 which provided for the interception of phone calls relating to the possession and sale of controlled substances and conspiracy related to those offenses. The warrant recited that normal investigative techniques would be unavailing,

1. The State Police also arranged to purchase drugs from Raymond and observe his movements on May 12, 1983; however, that plan proved unsuccessful because Raymond was otherwise occupied and had mechanical problems with his automobile.

2. The pen register was installed on May 18, 1983 pursuant to a court order.

that the warrant should be executed so as to minimize the interception of communications unrelated to the charges and that if a pattern of communications related to unlawful narcotics activity could be established, then use of the wiretap should be restricted "to such established times". The warrant also provided that "if from such established pattern, continued seizures are not necessary for a period of time * * * authorization is given to discontinue such seizure" and that the warrant was otherwise effective for 30 days.

The wiretap was installed on June 16, 1983. Between June 16 and July 12, 1983, the State Police intercepted a number of conversations which they believed were related to drug trafficking and submitted transcripts of these conversations to Judge Darrigrand as part of the application on June 12, 1983 for an extension of the eavesdropping warrant. The most significant phone conversation occurred on June 24 between Parker and a party identified as Chris Openheimer of Homestead, Florida. The transcript of this conversation reveals that Openheimer asked Parker whether he remembered "those kinds of plants that Jack and Jeff brought up to you." Parker indicated that he did and Openheimer said that friends of his "just found * * * 200 out in the woods." Openheimer offered to sell them for "forty a piece" but Parker replied that he was "pretty stocked up" and that his prices had dropped; he offered to buy "10 at 25". Navin alleged that this "guarded" conversation was really about kilos of cocaine and he reported learning from identified law enforcement officials in Florida that Openheimer operated a botanical nursery which may have been a front for illegal activities.

Parker also had conversations with Creaco on June 22 and July 6, 1983 and with another person on June 21 referring to the sale of "yellow paint", which Navin interpreted as related to drug transactions.[3]

The formal application by the District Attorney for the extension of the eavesdropping warrant incorporated by reference the original moving papers dated June 14, 1983 together with Navin's affidavit of July 12, 1983 with the attached transcripts. It appears from this application that the full extent of the drug activity involving Parker had not been determined and that Trooper D'Elia was continuing his efforts

---

3. In an affidavit dated August 12, 1983 prepared by Navin in support of a second extension of the warrant, he identified "yellow paint" as slang for Valium.

to arrange a direct buy from Parker through Raymond. On July 13, 1983 the court granted the requested extension for 30 days subject to "all provisions and restrictions as contained in the Original Eavesdropping Warrant dated June 14, 1983".

Between July 13 and August 12, 1983, the State Police intercepted a number of phone calls implicating all the defendants in drug trafficking. However, during the first week of August they also developed strong evidence that Raymond had been lying to them about dealing directly with Parker. At that time D'Elia was still trying to arrange a buy through Raymond and was with Raymond when he allegedly made a call to Parker's residence. When the call was not recorded on the wiretap the State Police realized Raymond had faked the call and that he was probably not dealing with Parker. The investigators also knew that neither the pen register nor the wiretap had uncovered a single phone call between Raymond and Parker.

On August 12, 1983, the District Attorney applied to Judge Darrigrand for a second 30-day extension of the eavesdropping warrant incorporating by reference the two previous warrants and the papers on which they were based and adding a new affidavit by Navin. He also sought to amend the warrant by removing Raymond's name and adding the names of Entwistle, Inserra, Creaco, Baris and one Nabil Bajjaly to the list of persons whose conversations were authorized to be seized, in addition to Parker.[4] Navin attached transcripts of nine conversations to his affidavit of August 12, 1983, including a series of five telephone calls on July 28 involving Entwistle, Baris, Inserra and others during which the participants talked openly about dealing in cocaine and revealed that a quantity of cocaine was buried on the Parker property. It appears that Parker was away on a fishing trip and that the calls concerned Entwistle's efforts to procure several ounces of cocaine for Baris without having to locate and dig up the drugs buried by Parker. Navin also included a transcript of an August 3, 1983 conversation between Creaco and Parker in which the two discussed deals for "smokeables", "yellow paint", "V" and

---

4. The original eavesdropping warrant referred to "Edward A. Parker and Walter F. Raymond and others acting in concert with Edward A. Parker." The seizure of conversations involving the other defendants was within the scope of the original warrant and extensions and the amendment to the warrant to include the names of Entwistle, Inserra, Creaco and Baris as persons who utilized the Parker telephone satisfied the requirements of CPL 700.65 (4).

a "Z" which Navin translated as references to marihuana, Valium and ounces of cocaine. On August 12, 1983, Judge Darrigrand granted an extension to "the original Eavesdropping Warrant, dated June 14, 1983" for an additional 30 days.

On August 22, 1983, 10 days later, Navin and D'Elia applied to Judge Darrigrand for search warrants covering the residence and property of Parker and Entwistle in Remsen, the residence and property of Inserra and his girlfriend, Suzan Toksu, in Utica and the residences of Creaco in Rome and Baris in Utica. In support of the Parker warrant Navin realleged the information from Santillo and Raymond, including the allegations that Raymond was dealing with Parker. Navin also summarized for the court information obtained from "a second confidential source of known reliability", later identified by Navin as the wiretap. In his affidavit, Navin relied on information gathered by this "source" from June 17 through August 20, 1983 to support the warrant application. Included among the conversations relied on by Navin were the July 28 conversations involving Entwistle and the August 3 conversation between Parker and Creaco, transcripts of which had been submitted to Judge Darrigrand on August 12. Navin also referred to conversations of July 30 and August 1 between Entwistle and Parker concerning the buried cocaine, a conversation of August 11 between Parker and Pardo and subsequent conversations with persons, described by him as "associates" of Pardo concerning a shipment of cocaine from Florida to Parker; however, transcripts of these conversations were not submitted at any time to Judge Darrigrand. D'Elia's supporting affidavit dealt primarily with his drug purchases from Raymond and his efforts to arrange a direct buy from Parker through Raymond. His affidavit, dated August 15, 1983, also referred to his dealings with Raymond through July 6, 1983. On August 23, 1983, Navin appeared before Judge Darrigrand and gave sworn testimony in support of the search warrants. At this time, Navin revealed that he was relying on the wiretap as his primary source of information and that he had personally heard and reviewed every taped conversation. In his testimony, Navin pieced together the information from the tapes with surveillance reports and information from other law enforcement agencies to support his conclusion that Parker was the leader of a major cocaine ring and that he was expecting a large shipment of cocaine from Florida within a matter of days.

Navin's affidavit in support of the Inserra warrants was

based entirely on information obtained from the wiretap. Navin again referred to the conversations of July 28, 1983 between Inserra and Entwistle and he also referred to conversations between Inserra and Parker which took place on August 11, 14, 15, and 17, 1983. His affidavit in support of the Creaco warrant referred to the telephone conversations on July 6 and August 3, 1983, to the information received from Santillo, and to the results of the physical surveillance during which Creaco was observed at the Parker residence. His affidavit in support of the Baris warrant also referred to the telephone conversations of July 28, 1983 and to additional telephone conversations involving Baris which took place on July 29 and August 4, 13, 18 and 19, 1983. Navin testified that he believed drugs would be found at the Inserra, Baris and Creaco residences because of a general pattern detected from the phone conversations which indicated that they never allowed themselves to run totally out of drugs. After hearing Navin's testimony, Judge Darrigrand issued the search warrants.

From August 22 until August 30, 1983, the State Police continued to gather information about the conspiracy through the wiretap. They learned on August 27 that Parker had received the expected shipment of cocaine. The search warrants were executed on August 30, 1983. The raids uncovered the large quantities of cocaine at the Parker residence and smaller quantities of drugs at the other residences. Parker, Entwistle, Baris, Inserra, and Creaco were then arrested and arraigned on August 30 on the felony complaints charging criminal possession of a controlled substance in the first degree. Pardo was arraigned on Federal charges on September 2, 1983.

On August 30, 1983, the State Police turned off the wiretap; they disconnected the device the following day. Grand Jury indictments were returned against the defendants on September 29, 1983 and October 6, 1983. Parker and Entwistle were arraigned on their indictments on October 3, 1983 and October 18, 1983. Baris was also arraigned on October 18, 1983. Creaco was arraigned on October 31, 1983. Pardo was arraigned on October 3, 1983 and October 7, 1983. The arraignment dates for Inserra are not clearly indicated.

Each of the defendants was served when arraigned on the indictments with copies of the eavesdropping warrant and extensions and the applications for the warrants. The defen-

dants subsequently moved to obtain the attachments to the warrant applications which had not been furnished upon their arraignment. These consisted of some photographs, a record of a conviction, records of toll calls and transcripts of the telephone conversations attached to the warrant applications. These items were turned over to defense counsel on December 21, 1984 approximately two months after the defendants were arraigned.

The defendants moved to suppress the evidence obtained pursuant to the eavesdropping warrants on the ground that the warrants were not based on probable cause. They also moved for suppression of the tapes on the basis of specifically described violations of CPL article 700. In addition, Parker, Entwistle, Baris, Inserra and Creaco moved to suppress the evidence obtained from the search warrants.

In a series of written decisions, Oneida County Court (Hurlbutt, J.), denied defendants' various motions following an extended suppression hearing which was expanded to include a hearing on the defendants' claim that false information was knowingly or recklessly furnished to the issuing Judge on the warrant applications. The court concluded that the warrants were based on an adequate showing of probable cause and that no violations of the requirements of CPL article 700 occurred. We agree.

The defendants contend that the eavesdropping and search warrants were not based on probable cause and are therefore invalid. They argue that the reliability of the confidential informant Santillo was not established and that his information was stale. They contend further that the State Police supplied false and misleading information to the issuing Judge with regard to the drug dealer Raymond and their efforts through surveillance to confirm or refute Raymond's claims that he dealt directly with Parker. They also claim that all the intercepted communications and any evidence derived therefrom should be suppressed on the ground of one or more violations of the procedures required under CPL article 700. In particular, it is claimed that the State Police failed to show the failure of normal investigative techniques (CPL 700.15 [4]), that the District Attorney failed to turn over the warrants and warrant applications within 15 days of arraignment (CPL 700.70), and that the warrants failed to include appropriate language limiting their duration to the period necessary to achieve the objective (CPL 700.30 [7]; 700.40).

## I

To obtain the eavesdropping warrants, the police used information from Joseph Santillo, whose reliability as a confidential informant was evidenced by allegations that he had given the police information leading to five drug buys from three individuals during April, May and June 1983. The fact that he provided accurate information in the past is an indicator of his reliability *(see, People v Rodriguez,* 52 NY2d 483, 489). Further, to establish the basis of his knowledge of Parker's drug activity the police reported that Santillo stated that on one occasion, one year before the application, he actually went inside Parker's house and saw Parker sell Creaco a quantity of cocaine from a large supply that Parker had. As the defendants point out, the problem with this information is that it was stale. However, stale information may be revived and acted upon "as long as the practicalities dictate that '[p]robable cause existent in the past [may] continue' " *(People v Christopher,* 101 AD2d 504, 527, *revd on other grounds* 65 NY2d 417, quoting *United States v Brinklow,* 560 F2d 1003, 1005, *cert denied* 434 US 1047). The State Police updated Santillo's information through Raymond who provided them with information that Parker was continuing the drug dealing through May 1983.

Raymond's reliability at the time of the June and July eavesdropping warrant was established because he directly admitted buying cocaine from Parker and these admissions against his penal interest evidence his credibility *(see, People v Wright,* 37 NY2d 88, 90-91; *People v Simon,* 107 AD2d 196, 198-199). Moreover, the basis for Raymond's information was his own personal knowledge, as he described to D'Elia his various transactions and interactions with Parker. The apparent reliability of his statements was established by Santillo's information and by the other corroborative information observed or collected by the State Police. Raymond's apparently reliable claim that he had purchased drugs from Parker on May 17, 1983, only four weeks before the original warrant application was made, justified the finding of probable cause at that time.

Neither the original eavesdropping warrant nor the July extension were invalid because the police alleged that Raymond was dealing directly with Parker when the police knew or should have known that he was not.

If a "false statement knowingly and intentionally, or with

reckless disregard for the truth, [is] included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause", the court reviewing the warrant must "set to one side" the false statement and determine whether probable cause is evidenced without the falsehood *(Franks v Delaware,* 438 US 154, 155-156). Defendant must prove by a preponderance of the evidence that the false statement was intentionally and recklessly made and mere negligence by the police in checking facts or recording information will not suffice *(Franks v Delaware, supra,* pp 169-170).

On May 17, 1983, Raymond allegedly called the police from Parker's house after buying drugs from Parker. However, the surveillance team near Parker's house did not see Raymond leave Parker's house. Thus, it appears the State Police had reason to suspect Raymond's reliability. The next day, however, they realized from aerial surveillance that Raymond could have visited Parker's house via an alternate route they had not known about and had not surveilled. Therefore, the truth was that the police could not be certain whether Raymond was at Parker's house. In the application, Navin averred that Raymond was a reliable source of information and said that surveillance at Parker's house had to be stopped because of the remoteness of the area and a sudden increase in local traffic. While it is true that the surveillance eventually had to be terminated for that reason, it was developed at the suppression hearing that the surveillance was in place during the time Raymond supposedly left Parker's house. At the very least, the police, in our view, showed a reckless disregard for the truth and should have told Judge Darrigrand the results of their surveillance *(see, United States v Melvin,* 596 F2d 492, 499-500, *cert denied* 444 US 837).

The validity of the warrant, however, is determined by whether the false statement is necessary to the finding of probable cause *(Franks v Delaware,* 438 US 154, 155, *supra; see also, People v Plevy,* 52 NY2d 58, 66). Thus, the falsehood should be deleted and the truth inserted to determine whether the warrant was based on probable cause *(see, United States v Ippolito,* 774 F2d 1482, 1484-1486; *compare, United States v Ferguson,* 758 F2d 843, 848, *cert denied sub nom. Baraldini v United States,* — US —, 106 S Ct 124).

If the truth is inserted here, probable cause would still be evidenced. The truth was that the surveillance could not confirm whether Raymond was at Parker's house on May 17.

The police were unsure because Raymond could have used an alternate route. The truth casts doubt upon Raymond's information but it does not eliminate probable cause because it does not establish that Raymond was lying.

The defendants also contend that the first extension of the eavesdropping warrant obtained on July 13 was not based on probable cause because by that time the State Police should have realized that Raymond was lying and deleted him as a source of information. There is no evidence that the State Police knew Raymond was lying. Quite to the contrary, D'Elia was continuing his effort to arrange a buy from Parker through Raymond. In any event, Raymond's information was by this time unnecessary to the finding of probable cause. In support of the application Navin attached transcripts of the conversation between Chris Openheimer of Florida and Parker. Openheimer and Parker discussed the purchase of "200 plants" that Openheimer's friends had "found out in the woods". Navin, who detailed his extensive experience in drug enforcement, averred that this conversation was about kilos of cocaine. This appears to be a reasonable interpretation (see, United States v Fury, 554 F2d 522, 530-531, cert denied 436 US 931; People v Manuli, 104 AD2d 386). Probable cause for the first extension can be found solely on this "plant" conversation.

The defendants further claim that the last extension of the eavesdropping warrant on August 12 was unjustified. This extension, however, was clearly based on probable cause established by the results of the wiretap standing alone. Navin attached the transcripts of several calls made by Entwistle on July 28 wherein the parties openly discussed cocaine and Entwistle revealed that she and Parker, along with other defendants, were involved in selling drugs.

## II

Defendants further claim that as a result of the alleged violations under CPL article 700 the tapes, together with the evidence obtained from the search warrants, which they claim were the fruits of the wiretap, should have been suppressed. We disagree.

Defendants argue initially that the applications for eavesdropping warrants were deficient because the People did not show that normal investigative proceedings had failed before applying for the eavesdropping warrants. Under CPL 700.15

(4), an eavesdropping warrant cannot issue unless the police show that "normal investigative procedures have been tried and have failed, or reasonably appear to be unlikely to succeed if tried, or to be too dangerous to employ". The case law establishes that eavesdropping warrants should not be used routinely as a first step in the investigation *(People v Gallina,* 95 AD2d 336). However, the police do not have to exhaust all possible steps before requesting an eavesdropping warrant and wiretapping does not have to be the last resort *(People v Carson,* 99 AD2d 664; *see, United States v Fury,* 554 F2d 522, 530, n 7, *supra; People v Versace,* 73 AD2d 304, 307-308). The issuing court must be apprised of the nature, progress and difficulties in the investigation to insure that eavesdropping is more than just a "useful tool" *(People v Gallina, supra,* p 340; *People v Carson, supra; People v Versace, supra).* The court must test the People's showing in a practical and common-sense fashion in the context of the objectives of the investigation *(United States v Lilla,* 699 F2d 99, 103; *People v Rumpel,* 111 AD2d 481, 482).

Under these principles, the police made an adequate showing in their applications. The original warrant application alleged that the State Police repeatedly unsuccessfully tried through their informants to infiltrate Parker's conspiracy, make his acquaintance and observe his illicit operation first hand. In addition, the application described the efforts of the police to conduct a physical surveillance of Raymond and Parker. Related to this last allegation, the application alleged that direct surveillance of Parker's house was difficult to maintain because it was located in a remote area. Photographs attached to the affidavit demonstrated that his residence could not be seen from the road. Finally, the application explained that the police were using information from the FBI and DEA to develop leads in the case. In our view, this was a sufficient showing that "normal investigative procedures [had] been tried and * * * failed" (CPL 70.15 [4]; *cf. People v Viscomi,* 113 AD2d 76).

The first extension application also complied with CPL 700.15 (4). It alleged that Raymond was still refusing to introduce D'Elia to Parker. Moreover, the application details extensive efforts made by the State Police to check various leads through the Florida Department of Law and other police agencies. On balance, the application complied with the statute because the police were still trying to infiltrate the conspiracy through Raymond.

This analysis also applies to the last extension. The application revealed that Raymond was still refusing to take D'Elia to Parker's house. This indicates that the police were still trying to make a direct buy from Parker, although by this time they suspected Raymond of lying to them. In any event, even if a direct buy from Parker had been arranged, that would not have necessarily meant that their objective had been attained and that the police would have been invited into the conspiracy. Therefore, the wiretap was still necessary to uncover the full extent of the conspiracy.

## III

The defendants' claim that the District Attorney did not give proper pretrial notice of the wiretaps and failed to furnish the entire warrant applications within 15 days of the arraignment has no merit.[5]

CPL 700.70 provides that: "The contents of any intercepted communication, or evidence derived therefrom, may not be received in evidence or otherwise disclosed upon a trial of a defendant unless the people, within fifteen days after arraignment and before the commencement of the trial, furnish the defendant with a copy of the eavesdropping warrant, and accompanying application, under which interception was authorized or approved. This fifteen day period may be extended by the court upon good cause shown if it finds that the defendant will not be prejudiced by the delay in receiving such papers."

We must first decide whether the 15-day period began to run upon the initial arraignment on the felony complaints or from the dates of defendants' arraignment on the indictments. Case law (see, e.g., People v Basilicato, 64 NY2d 103; People v Mark, 68 AD2d 315) and the legislative history of the section support the latter view.

Prior to 1976, CPL 700.70 provided that the warrant and application only had to be turned over at least 10 days prior to trial. Pursuant to the Laws of 1976 (ch 194) this was

---

5. Defendant Creaco does not raise any claim under CPL 700.70 in his own brief; however, he incorporates by reference the points of argument developed in the briefs of his codefendants. Defendant Pardo also claims that suppression is required under 18 USC § 2518 (9) because he was arrested initially on Federal charges; however, that section does not apply here because the wiretap orders were issued under CPL article 700 and no communications were intercepted pursuant to Federal wiretap provisions.

changed to 15 days following arraignment. The purpose of the change was "to further effectuate the purposes of chapter 763 of the laws of 1974" which added CPL article 255 establishing the omnibus pretrial motion procedure (1976 NY Legis Ann, at 4). Pursuant to CPL 255.20 (1) "all pre-trial motions shall be served or filed within forty-five days after arraignment" or, in the case of motions to suppress eavesdropping evidence, within 45 days after service of papers under CPL 700.70. Since the single omnibus motion contemplated by article 255 includes motions to dismiss an indictment (CPL 255.10 [1] [a]) it is obvious that the defendant's time does not begin to run until arraignment on the indictment, which date also then controls for purposes of defining arraignment under CPL 700.70.

In prior cases raising CPL 700.70 objections it has been held that unexcused noncompliance with the statute's commands requires suppression of the wiretap evidence *(People v Schulz,* 67 NY2d 144; *People v Basilicato, supra,* p 117; *People v Barnes,* 110 AD2d 1079; *People v Mark, supra).* In our view, the cases at bar are distinguishable because the People within 15 days of arraignment on the indictments timely furnished defendants with the required warrants and applications, except for some attachments. Thus, unlike the prior cases which involved total noncompliance with the statute, there is presented here a situation where the People complied with the statute within 15 days of arraignment. Various attachments to the warrant applications were not turned over until December 21, beyond the 15-day period, and then only after defendants moved to obtain the attachments. The delay did not work any prejudice to the defendants and did not prevent them from moving to suppress the eavesdropping warrants as part of their pretrial omnibus motions for relief.

## IV

Defendants also argue that the original warrant and extensions failed to require that the authorization "must terminate upon attainment of the authorized objective, or in any event in thirty days" (CPL 700.30 [7]; 700.40) and that the State Police continued to intercept communications under the second extension after the "objective" was achieved. Rather than simply copying the statutory language the District Attorney drafted his own version which, applied literally, conveys the impression that the wiretap could be terminated by the State Police and subsequently reactivated without further court authorization. However, this situation never arose and the wording sufficiently conveyed the idea that the warrant had to

terminate upon achievement of the objective and could not operate more than 30 days and thus, fulfilled the statutory mandate.

Moreover, this provision from the original warrant was incorporated into the extensions. The first extension order explicitly incorporated by reference the original warrant. The second extension order issued expressly provided that it was an extension of the original eavesdropping warrant and in our view implicitly incorporated by reference all the provisions of original warrant not otherwise amended in the extension warrant.

In any event, the warrant was in fact terminated when the objective was achieved and within 30 days of the second extension and suppression was not required *(see, People v Palozzi,* 44 AD2d 224). *People v Mark* (68 AD2d 315, *supra)* does not compel a contrary result for there the search warrant was the objective of the wiretaps while here the State Police were concerned with uncovering a conspiracy and properly continued the phone taps until August 30 when the search warrant was executed and the conspirators arrested.

## V

Based upon the information gathered throughout the investigation, including that obtained from Santillo and Raymond as well as the wiretap, the State Police applied on August 22, 1983 to Judge Darrigrand for the search warrants. The information relating to Raymond must be excised because the State Police misled Judge Darrigrand and omitted from the application and testimony in support of the warrants any hint that Raymond's information was unreliable *(Franks v Delaware,* 438 US 154, *supra).* The tip provided by Santillo was stale, therefore, the validity of the Parker and Inserra warrants depends on whether the untainted information from the wiretap, considered alone, establishes probable cause to support the warrants *(People v Arnau,* 58 NY2d 27, 33, n 1; *People v Plevy,* 52 NY2d 58, *supra).*

In his affidavit supporting the application for the Parker search warrant and in his sworn testimony before Judge Darrigrand, Navin summarized more than 20 phone calls which he claimed provided reasonable cause to believe that Parker was the leader of an active drug ring and that cocaine

and perhaps other drugs were stored on his property. Navin testified that he had personally reviewed every conversation which had been intercepted. He stated in his affidavit that the conversations "have been interpreted by me, based on my being personally involved in talking to drug traffickers while working in an undercover capacity, investigating persons involved in the trafficking of controlled substances, and in particular, cocaine and heroin, and my past and present four and one-half years experience while assigned to the Troop D Major Crimes Unit" during which time he had "worked in an undercover capacity posing both as drug dealer and user, learning the habits, language and characteristics of controlled substance violators". Navin did not attach a single transcript to his affidavit nor is there any indication in the record that the court had or requested the opportunity to listen to the tapes. Instead of reviewing the direct evidence of criminal activity in the tapes, the court relied on Navin to draw reasonable inferences from the tapes and determined that probable cause existed on the basis of this filtered information.

"[C]ryptic and ambiguous conversations may serve as a predicate for probable cause when reasonably interpreted by an experienced investigator" (People v Manuli, 104 AD2d 386, 388, supra). The court, however, cannot discharge its duty to determine whether the conversation has been "reasonably interpreted" without a transcript. Here, Navin's application for a search warrant came only after Judge Darrigrand had been actively involved in the investigation for two months. Navin's appearance before Judge Darrigrand on August 22 was his fourth since June 14 in connection with this case and Judge Darrigrand was obviously familiar with both Navin and the facts. On two prior occasions he had opportunities to review transcripts of intercepted conversations and compare them with Navin's interpretation. Navin's general reliability as an expert in narcotics cases had already been established. Moreover, on August 12, Navin had submitted to the court in connection with the applications for a second extension of the wiretap approximately 30 pages of transcript, including some of the telephone communications he subsequently relied upon to justify the search warrants. In particular, the court had before it transcripts of the July 28 calls involving Entwistle and several other defendants. In the course of these conversations, the participants related several times that Parker had buried drugs somewhere on his property. These conversations

alone established the existence of probable cause to issue the Parker search warrant.[6]

For the same reasons, we conclude also that the Inserra search warrant was supported by probable cause. Although Navin failed to attach transcripts to his application for a warrant, he relied in his affidavit on an August 3 conversation between Parker and Inserra. The transcript of this conversation had been submitted to the court on August 12 in connection with the application for an extension of the eavesdropping warrant. Consequently, the failure to resubmit a transcript on August 22 must be deemed a harmless omission. Similarly, in support of the Baris warrant, Navin relied on the July 28, 1983 telephone conversation between Entwistle and Baris which had been submitted to the court. The record as a whole shows that probable cause existed to issue these search warrants.

Navin's affidavit, a part of the application for the Creaco search warrant, stated that Santillo told the police that on April 21, 1983 Creaco told him that he was selling cocaine from his house. The affidavit also averred that D'Elia was present "when [Santillo] personally contacted CREACO at the CREACO residence located at 1812 Copperfield Street, Utica, New York, for the purpose of arranging a meeting between CREACO and D'ELIA to transact a cocaine deal. That at that time and place, CREACO refused to deal cocaine with D'ELIA, but advised [Santillo] that he would in fact deal cocaine with [Santillo]". At the suppression hearing D'Elia said this information was disclosed in a telephone conversation between Santillo and Creaco while he was present with Santillo. This information evidences probable cause because Santillo's reliability was established and he was reporting a direct conversation with Creaco. Although this information was four months old when the police applied for the search warrant, on balance, it was current enough to support probable cause because Creaco expressed a willingness to sell to Santillo and it can be reasonably inferred that Creaco was conducting this business over a period of time and was likely to continue (see, United States v Kuntz, 504 F Supp 706, 709). Moreover, Navin's

---

6. Defendants argued that the Parker search warrant was an invalid anticipatory search warrant; however, the evidence submitted to Judge Darrigrand indicated a substantial probability that the seizable property would be on the premises when searched, therefore, the warrant was valid (People v Glen, 30 NY2d 252, cert denied sub nom. Baker v New York, 409 US 849).

affidavit referred to the July 6, 1983 conversation between Creaco and Parker during which they discussed the sale of drugs. A transcript of this conversation had been submitted to Judge Darrigrand on July 12, 1983. Evidence linking Creaco to Parker, developed as the result of physical surveillance by the State Police, was also related in Navin's affidavit.[7] Probable cause was therefore established and suppression was not required.

The remaining issues raised by the defendants have been examined and are found to be without merit. We perceive no abuse of discretion in the sentences imposed on the defendants. The judgments should be affirmed.

CALLAHAN, J. P., DENMAN and BOOMER, JJ., concur.

Judgments unanimously affirmed.

---

**7.** Certain of the defendants requested a second *Franks* hearing *(Franks v Delaware,* 438 US 154) on their motions to suppress the search warrants; however, the suppression court deleted the information from Raymond without the necessity of an additional hearing and defendants failed to show any basis for a hearing with regard to the remaining information supplied by Navin and the requests for a hearing were properly denied.