OPINION OF THE COURT
John A.K. Bradley, J.
The defendants are charged in three indictments with manipulating the over-the-counter stock market. Included among the defendants are three securities firms and 15 individual defendants. The most significant count charges the crime of enterprise corruption in that from on or about September 18, 1987, through on or about February 14, 1990, the defendants having knowledge of the existence of a criminal enterprise and the nature of its activities, and being members of and associated with that criminal enterprise, intentionally conducted and participated in the affairs of the enterprise by participating in a pattern of criminal activity. Specifically, the defendants a group of ostensibly independent, competitive securities firms and individuals are charged with acting together as a single criminal enterprise secretly rigging trading in certain securities some of which were traded on NASDAQ and some were listed on the "pink sheets” (daily listings of over-the-counter stocks), fraudulently concealing collusive transactions, creating a false appearance that certain quotations in the NASDAQ system were honestly set, providing false financial information and other activities. The defendants are also charged with numerous counts of falsifying business records, grand larceny, conspiracy and other crimes.
*778 The defendants have moved to dismiss the indictments on numerous grounds. The motion is denied in part, as follows:
THE MOTION TO SUPPRESS THE WIRETAP EVIDENCE

Standing

During the course of this investigation, the People made use of electronic surveillance, specifically wiretapping. The defendants have all moved to suppress the results of the electronic surveillance. CPL 710.20 provides that a defendant who has been "aggrieved by unlawful or improper acquisition of evidence” may seek to suppress it. This includes evidence obtained as a result of electronic eavesdropping. (See, CPL 710.20 [2].) An aggrieved person includes, pursuant to CPL 710.10 (5), those persons set out in CPLR 4506 (2). CPLR 4506 refers to senders or receivers of electronic communications, parties to such communications, and persons against whom the eavesdropping was directed.
Applying these principles to the interception of telephone conversations, the courts have established a well-settled rule that standing to challenge such communications requires that either the movant have been heard on the phone, or that it was his telephone that was tapped. (United States v Burford, 755 F Supp 607 [SD NY 1991]; United States v Fury, 554 F2d 522, cert denied Fury v United States, 436 US 931; People v Edelstein, 54 NY2d 306 [1981]; People v Contento, 146 AD2d 959; People v Konyack, 99 AD2d 588.)
As outlined above, the first warrant was issued by Appellate Division Presiding Justice Mollen on May 6, 1988 and was directed against the phones of one Howard Citron formerly a defendant in this case who has now pleaded guilty. The Citron warrant was extended on June 2, 1988 and July 1, 1988. On July 20, 1988 warrants were obtained against phone lines of Wakefield in White Plains and New York. These warrants were issued by Justice Mollen and this court. These warrants were extended on August 16, 1988 and September 14, 1988.
The defendants seek to suppress the eavesdropping evidence based on infirmities in the Citron warrants, and extensions thereof. Defendant Minella, and only he of the remaining defendants, has standing to challenge the original Citron wiretap, as he was intercepted in overheard conversations. Further as to the extensions of the Citron warrant, for similar reasons defendants Minella and Eng have standing. The People argue correctly, however, that while other defendants may *779 have standing to challenge the subsequent Wakefield warrants on a number of grounds, they may not reach back to challenge the Citron warrants. As to which they otherwise did not have standing, on some theory that the subsequent warrants were the fruit of a poisonous tree (and that they may therefore attack the tree itself). (See, People v Troia, 104 AD2d 389; People v La Rocca, 112 AD2d 1010.) In La Rocca, the police had conducted eavesdropping and learned of the possible illegal activities of one Pelóse. They then obtained a warrant to tap Pelose’s phones, at which time they recorded La Rocca. The Court denied La Rocca the right to challenge the original warrants on the grounds that he had no standing, having neither been tapped nor intercepted. As to the later warrant, he of course had standing, but the fact that the results of the original warrant had led to the later warrant did not justify the defendant reaching back to challenge the original warrant.
To permit this, as the defendants suggest, would eviscerate the standing rule and create great anomalies. Thus, if the defendants were correct, someone mentioned on a wiretap not directed at his phone (nor in which he was intercepted) and later indicted without further electronic surveillance, could not challenge the wiretap, but an identical defendant who was later intercepted on a subsequent wiretap could challenge not only the later interception but also the original one. There is no basis for such a rule and this court will not adopt it. In People v Koutnik (44 AD2d 48 [1st Dept 1974], affd 37 NY2d 873), cited by the defendants, the parties had reached a stipulation as to standing with respect to 107 warrants. To the extent that the courts in People v Amsden (82 Misc 2d 91 [Sup Ct, Erie County 1975]) and People v Brown (80 Misc 2d 777 [Sup Ct, NY County 1975]) reach a result different from this court, this court respectfully disagrees.
Finally, similar principles govern the standing to challenge minimization (see, People v Sergi, 96 AD2d 911), and the court’s holding is equally applicable thereto.
THE NECESSITY FOB ELECTRONIC EAVESDROPPING
The defendants argue that the People have failed to demonstrate that less intrusive means of investigation than electronic eavesdropping were not appropriate. Thus, defendants urge, the wiretapping was inappropriate and must be suppressed.
*780 Pursuant to CPL 700.15 (4) and 700.20 (2) (d) an application for an eavesdropping warrant must contain "[a] full and complete statement of facts establishing that normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to employ, to obtain the evidence sought.”
The statute is designed to ensure that wiretapping is not the routine initial method of investigation, but there is no requirement that it be only the last resort, or that all other imaginable means of investigation have been absolutely and completely exhausted. (United States v Giordano, 416 US 505; United States v Bailey, 607 F2d 237; People v Gallina, 95 AD2d 336.)
As the Court in People v Baris (116 AD2d 174, 187, lv denied 67 NY2d 1050) held: “The case law establishes that eavesdropping warrants should not be used routinely as a first step in the investigation (People v Gallina, 95 AD2d 336). However, the police do not have to exhaust all possible steps before requesting an eavesdropping warrant and wiretapping does not have to be the last resort (People v Carson, 99 AD2d 664; see, United States v Fury, 554 F2d 522, 530, n 7, supra; People v Versace, 73 AD2d 304, 307-308). The issuing court must be apprised of the nature, progress and difficulties in the investigation to insure that eavesdropping is more than just a 'useful tool’ (People v Gallina, supra, p 340; People v Carson, supra; People v Versace, supra). The court must test the People’s showing in a practical and common-sense fashion in the context of the objectives of the investigation (United States v Lilla, 699 F2d 99, 103; People v Rumpel, 111 AD2d 481, 482).”
In the affidavit of Assistant District Attorney Rubie Mages, the People made a detailed and sufficient showing to meet the required test. At great length she described the other investigative techniques that had been utilized for more than four months, including use of a confidential informant, physical surveillance, and pen registers. While this investigation had produced much information tending to show that indictable offenses had occurred, it had not produced enough evidence to obtain an indictment, and the People demonstrated that these techniques had yielded all they would. In particular, the People demonstrated that the confidential informant could not penetrate into the alleged criminal enterprise any farther than had been done already.
*781 In sum, the People adequately met their burden of demonstrating that wiretapping was an appropriate method of investigation as provided in the CPL.
PROBABLE CAUSE ISSUES
The defendants have argued that the June 2,1988 extension of the Citron warrant was not based on probable cause because no evidence of securities fraud was uncovered during the execution of the original warrant. Eavesdropping warrants must meet the "probable cause” requirements that are applicable to search warrants. (CPL 700.15 [2], [3]; 700.20; People v Tambe, 71 NY2d 492.) A finding of probable cause requires that facts be presented to the issuing officer sufficient to warrant a prudent person to believe that evidence of a crime will be obtained through the use of electronic surveillance. (United States v Fury, 554 F2d, at 530, supra.) Requests for extension of the warrant must, in addition to the requirement of probable cause, contain a statement setting forth the results thus far obtained.
Once a warrant is issued it is presumptively valid and the defendant must prove that the issuing officer abused his discretion. (People v Manuli, 104 AD2d 386.) The reviewing court should resolve any doubts as to probable cause in favor of upholding the warrant, and may rely on reasonable inferences which can be drawn from the allegations of fact set forth in the application. (United States v Jackstadt, 617 F2d 12, cert denied Jackstadt v United States, 445 US 966; People v Sinatra, 102 AD2d 189; People v Ianniello, 156 AD2d 469, lv denied 75 NY2d 920.)
In support of the extension of the warrant, the People submitted affidavits from New York County District Attorney Robert Morgenthau, Assistant District Attorney Rubie Mages, and Detective Robert Scheidle. The Scheidle affidavit described the investigation and the results of the electronic surveillance so far. The court has once again reviewed the Scheidle affidavit and believes the showing adequately met the standards for continuing the surveillance, including that some of the conversations already intercepted related to unlawful activity.
AMENDMENT OF WARRANTS
The defendants challenge the right of the People to utilize the intercepted conversations in connection with the crime of *782 enterprise corruption. Specifically, the defendants argue that the People’s failure to amend the warrants to specify enterprise corruption as a target crime precludes the use of the intercepted conversations to prove that crime.
CPL 700.30 (4) provides that an eavesdropping warrant must contain "a statement of the particular designated offense to which it relates.” Designated offenses are defined in CPL 700.05 (8), and enterprise corruption is not one so listed. There is no dispute among the parties that the People could not have included enterprise corruption at the time of the issuance or amendment of the warrants. If this offense were to be included it could only be by amendment.
Recognizing that the concept of "plain view”, well defined as to search and seizure, is equally applicable to electronic interception, CPL 700.65 (4) includes a retrospective amendment procedure. This section provides that: "[w]hen a law enforcement officer, while engaged in intercepting communications * * * in the manner authorized by this article, intercepts a communication or makes an observation which was not otherwise sought and which constitutes evidence of a crime that has been, is being or is about to be committed, the contents of such communications * * * and evidence derived therefrom * * * may be used under subdivision three when a justice amends the eavesdropping warrant * * * to include such contents.” The People argue that the case of People v Gnozzo (31 NY2d 134, cert denied sub nom. Zorn v New York, 410 US 943) is dispositive in addressing the issue. According to the People, the Court of Appeals held in Gnozzo that as long as evidence as to the crime at issue was "sought” in the warrant, the amendment requirement is not triggered. The defendants distinguish Gnozzo on the asserted grounds that it deals with the requirement of amendment to designate new targets of surveillance, and not new crimes.
This court is convinced that the amendment was not necessary. The "not otherwise sought” requirement is designed to insure that the eavesdropping process not be abused to the extent that the police may utilize the process to seek evidence as to crimes other than the ones they disclose to the court in seeking the warrant. To the extent that the crime discovered is within the ambit of the crimes disclosed to the judicial officer approving the warrant, the requirement of the statute is satisfied. (See, People v Gnozzo, 31 NY2d 134, supra.)
Here in particular, the People could not have specified the *783 crime of enterprise corruption in the original warrant because it is not an approved designated offense. Yet it is clear that such offense is within the ambit of the crimes sought to be discovered in the surveillance. The affidavit of Rubie Mages submitted in support of the original Citron warrant identified the designated offenses as falsifying business records, offering a false instrument for filing, felony Martin Act violations, and conspiracy to commit those crimes. The affidavit identified the objectives of the surveillance as identifying participants in fraudulent stock transactions, obtaining evidence as to how such transactions were handled, "defining the scope of that particular enterprise”, obtaining evidence as to who supervises and benefits from each of these criminal enterprises, and obtaining evidence as to the role of organized crime in each of these criminal enterprises. Similar language was contained in each of the subsequent affidavits. Moreover, the ultimate indictment charged the substantive crimes mentioned in the warrants and the applications therefor, and those crimes are pleaded as pattern acts within the enterprise corruption count.
Under the circumstances, the court concludes that the crime of enterprise corruption was otherwise sought in the eavesdropping warrants, and amendment was not required.
ENTERPRISE CORRUPTION
The defendants move to dismiss the enterprise corruption counts on three grounds: that New York’s enterprise corruption statute is unconstitutionally vague, that the indictment here for enterprise corruption should be dismissed in the interest of justice as inconsistent with the intention of the Legislature, and that the indictment fails to allege a criminal enterprise as defined in Penal Law § 460.10 (3).
While the Federal RICO statute has been criticized as perhaps being impermissibly vague (see, H.J. Inc. v Northwestern Bell Tel. Co., 492 US 229), and while article 460 of the Penal Law was inspired by the RICO statute (18 USC § 1961 et seq.), the experience of the Federal courts with RICO was examined closely by the Legislature, and article 460 was designed to target certain criminal activities more precisely defined and with less sweep than RICO. Perhaps chief among the criticisms of RICO has been the elusive concept of "enterprise”, as to which there is no requirement that the enterprise be a criminal one. (See, United States v Turkette, 452 US 576: *784 United States v Indelicato, 865 F2d 1370, cert denied Indelicato v United States, 493 US 811; United States v Stolfi, 889 F2d 378.)
The New York Organized Crime Control Act’s enterprise corruption sections were designed to rectify some of these perceived deficiencies. Thus, the legislative findings accompanying the statute point out that the statute contains more rigorous definitions than other similar statutes, which limit the statute’s applicability. Chief among these definitional restrictions is New York’s requirement that a perpetrator act with intent to participate in or advance the affairs of a criminal enterprise. The statute defines "criminal enterprise” as a "group of persons sharing a common purpose of engaging in criminal conduct, associated in an ascertainable structure distinct from a pattern of criminal activity, and with a continuity of existence, structure and criminal purpose beyond the scope of individual criminal incidents.” (Penal Law § 460.10 [3].) The result of the statute is that there must be a criminal enterprise with a structure and purpose as set forth in the statute and the defendant must know of its existence and the nature of its activities. This court is convinced that the statute passes constitutional muster.
The defendants next attack the People’s allegation that a criminal enterprise was formed and continued. In contrast to the defendant’s argument, the Grand Jury was in fact presented with substantial evidence that otherwise discrete and independent securities professionals in fact acted together to control price and supply of certain securities on an ongoing basis. In particular, there was evidence that brokers entered quotes into the NASDAQ system at the direction of allegedly independent brokers, and that upon occasion, a broker would obtain approval from one of the other allegedly independent brokers before effectuating a trade. Moreover, the evidence presented, including the eavesdropping evidence, established the defendants’ unlawful purpose to profit from their manipulative market tactics.
The indictment also described the criminal enterprise as having an ascertainable structure, with Alexander and Keith Minella, and John and George Kevorkian operating at the top of the structure in planning the objectives of the enterprise, and directing how the trading would occur to achieve the objectives. The indictment places Parsons Eng, Joseph Zaborowski, Keith Friedman, Joseph Elkind, and Don Delvecchio at the middle level of the enterprise, and certain other traders *785 and brokers at the bottom level. Nothing prevents the defendants, of course, from challenging all or any part of this alleged structure at trial, but for purposes of indictment, the People have met their burden. Moreover, the allegation is not that the defendants coalesced to manipulate the market with respect to a single security, but rather that they continued to operate in the same manner with respect to several securities and, though not all defendants were involved in every deal, there was a continuing structure and purpose.
Here the court concludes after a careful review of the indictment and the evidence presented to the Grand Jury that, unlike in People v Moscatiello (149 Misc 2d 752), the People have properly charged an enterprise with an ascertainable structure distinct from a pattern of criminal conduct, including a system of authority beyond what is minimally necessary to effectuate individual substantive criminal offenses. (See, United States v Bledsoe, 674 F2d 647.) The People have shown more than a mere ad hoc association. (Delta Truck & Tractor v Case Co., 855 F2d 241 [5th Cir 1988], cert denied 489 US 1079.) The court also takes note of the ongoing business, social, familial and corporate relationship among the defendants here, which was not present in Moscatiello.
The defendants also argue that the People have not charged an enterprise which was continuing. Drawing an analogy from the Federal RICO statute, the requirement of continuity does not require that no members leave or that new ones do not join, so long as the enterprise continues with the same purpose and that the new members coming in fill roles performed previously in the group. (United States v Bledsoe, 674 F2d, at 665, supra.) Nor does the management structure need to be so rigid as to resemble the formalistic corporate flow chart. Different individuals may fulfill different management roles at different times, and delegation of decision making is permitted. (United States v Bledsoe, 674 F2d 647, supra; United States v Lemm, 680 F2d 1193, 1199, cert denied Lemm v United States, 459 US 1110.) As the court in United States v Kragness (830 F2d 842, 856 [8th Cir 1987]) held: "Continuity of structure exists where there is an organizational pattern or system of authority that provides a mechanism for directing the group’s affairs on a continuing, rather than an ad hoc basis. Bledsoe, 674 F.2d at 665; Lemm, 680 F.2d at 1199; Riccobene, 709 F.2d at 222. The continuity-of-personnel element involves a closely related inquiry, in which '[t]he determinative factor is whether the associational ties of those *786 charged with a RICO violation amount to an organizational pattern or system of authority.’ Lemm, 680 F.2d at 1199, citing Bledsoe, 674 F.2d at 665; see Riccobene, 709 F.2d at 223. The continuity of these elements need not be absolute; the group’s system of authority may be modified, old members may leave, and new members may join. Bledsoe; Lemm; Riccobene * * * That some changes in structure and personnel occur does not mean that there is no mechanism for continuing direction of group affairs; both the structure and the personnel of an enterprise may undergo alteration without loss of the enterprises’s identity as an enterprise.”
The indictment and presentation to the Grand Jury sufficiently charged a continuing enterprise to satisfy the statutory requirement.
Finally, the court rejects the suggestion that the enterprise corruption statute was not intended to cover "ordinary white collar crime”, and that it was designed only for the "Mafia”. While this court has expressed its concern that simple criminal activity, whether white collar or otherwise, not be expanded into a complex enterprise crime, this court believes the Legislature precisely intended to cover crimes such as this where it is alleged that a structure is established to engage in continuing pattern dominated criminal activity. While it may be designed to cover "organized crime”, that is precisely what is charged here, notwithstanding the absence of La Cosa Nostra. (See, Penal Law § 460.00.)
This motion is decided in accordance with this opinion.